UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EDUCATIONAL CREDIT
MANAGEMENT CORP.,

                Appellant,

      v.

VALERIE ANN DEGROOT,

                Appellee.

No. CV05-1470-MO

OPINION AND ORDER

**MOSMAN, J.,**

      Appellee Valerie DeGroot filed a Chapter Seven bankruptcy petition in April 2004, and

in April 2005, the bankruptcy court discharged several of her debts.  At issue is the discharge of

her student loan.  The bankruptcy court discharged the student loan finding repayment would

impose an undue burden on Ms. DeGroot.  The appellant, Educational Credit Management Corp.

("Educational Credit"), is a private, non-profit loan guaranty agency participating in the Federal

Family Education Loan Program.  Under this program, private lenders lend money to students

seeking degrees at qualifying institutions, without regard to their creditworthiness.  Guarantee

agencies, like Educational Credit, guarantee these loans against default and are reinsured by the

United States Department of Education.  Educational Credit guarantees Ms. DeGroot's loan and

filed this appeal asserting the bankruptcy judge erred in discharging the loan.  Because I find Ms.

DeGroot has not met her burden to justify discharge under the relevant standard, I REVERSE the

PAGE 1 - OPINION AND ORDER

bankruptcy court's decision and REINSTATE the loan.

## Background

Before the time relevant in this case, Ms. DeGroot earned a B.A. in Journalism and a M.S. in Taxation. She took loans out in connection with these degrees and paid them all back in full. After earning her first two degrees, Ms. DeGroot worked as a CPA and a litigation specialist, and at one point had her own accounting firm. She also has foreign language skills and testified she used to be fluent enough in Spanish to conduct business meetings in Spanish. In her early forties, Ms. DeGroot returned to school to earn an M.B.A. She attended Thunderbird American Graduate School and graduated when she was approximately 45 years old. The debt she incurred earning this degree is at issue here.

After graduating, Ms. DeGroot engaged in an extended job search and ultimately found a position with an office furniture supply company based out of Michigan. She had extensive responsibilities and at one point held the position of Chief Financial Officer. However, the company experienced difficulty as a result of the downturn in the economy in the early part of this decade, so she began to look for other employment, though she admits her efforts were limited because she was still working. To avoid losing her job with the furniture company, Ms. DeGroot transferred to a position in the Portland area in 2001, but not long after, the company sold the Portland operation, and she was laid-off[1] in April 2002. During the entire time she was

---

[1]Educational Credit suggests Ms. DeGroot was not laid off but instead quit her job. In support of its view it points to one of her interrogatory responses where she stated, "Kelly Services [her prior employer] reported that I had quit without notice, which was patently untrue and in violation of the severance agreement." Ms. DeGroot went on to describe how she contested her employer's allegation, but that she lost and was required to pay back unemployment benefits she had received. The bankruptcy court apparently found Ms. DeGroot's version of events credible, and this finding is not clearly erroneous.

working full-time, she made payments on her student loans.

Facing the fact that her professional accounting licenses had expired, and the fact that there was no guarantee she could get a job due to the depressed economy, specifically, the accounting profession, Ms. DeGroot decided to go into business for herself. In 2002[2] she opened a yarn shop in Portland using part of a $75,000 inheritance she received from her mother to get started. Since its opening, the business has operated at a loss. In 2003 it had a net loss of $23,000. Trial Tr. at 22. However, it has shown improvement, and in 2004, the business was able to stand on its own without significant contributions from Ms. DeGroot. Ms. DeGroot also began paying herself a $700 a month salary. She also receives some benefits from the business, including health insurance and vehicle expenses, and she has some retirement from her prior job, which she uses periodically to meet her expenses.

Shortly after losing her prior job, Ms. DeGroot consolidated her student loans, which totaled just under $36,000 at the time. As part of this consolidation, she chose a 20-year repayment plan. When she filed for bankruptcy a year and a half later, her student loan was just under $38,000. Ms. DeGroot is now in her mid-fifties, in generally good health, and has no dependants. She lives alone in a three-bedroom home that she owns worth approximately $180,000-$200,000, and she has a $150,000 mortgage. Her estimated monthly expenses after the bankruptcy proceedings is just under $2,000 a month.

The bankruptcy court held a trial in this case in March 2005, and Ms. DeGroot was the sole witness. Just before the trial, Ms. DeGroot went on a one-week European vacation. Based

---

[2]It is unclear from the record whether she started her business in April or November of 2002.

on the evidence presented at trial, Bankruptcy Judge Dunn issued an oral decision discharging

her student loan.

**Discussion**

The district court has appellate jurisdiction over final decrees and orders from the

bankruptcy court.  28 U.S.C. § 158(a).  This court reviews *de novo* whether the bankruptcy court

applied the correct legal standard in discharging a student loan.  *Rifino v. United States (In re*

*Rifino)*, 245 F.3d 1083, 1087 (9th Cir. 2001).  The bankruptcy court's findings of fact are

reviewed for clear error.  *Id.* at 1086.

The purpose of bankruptcy is to give good-faith debtors a fresh start.  *Little v. Reaves (In*

*re Reaves)*, 285 F.3d 1152, 1157 (9th Cir. 2002).  In tension with this overall purpose, student

loans are presumptively non-dischargeable.  *Rifino*, 245 F.3d at 1087 ("Generally, student loan

obligations are presumed to be nondischargeable in bankruptcy pursuant to 11 U.S.C. §

523(a)(8)").  However, there is a limited exception to this presumption where repayment of

student loans "would impose an undue hardship on the debtor and the debtor's dependents."  11

U.S.C. § 523(a)(8).[3]  Congress has not defined "undue hardship."  Thus, in addressing this issue,

---

[3]This provision states in entirety:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of
> this title does not discharge an individual debtor from any debt--
> . . .
> (8) unless excepting such debt from discharge under this paragraph
> would impose an undue hardship on the debtor and the debtor's
> dependents, for--
> (A)(i) an educational benefit overpayment or loan made, insured,
> or guaranteed by a governmental unit, or made under any program
> funded in whole or in part by a governmental unit or nonprofit
> institution; or
> (ii) an obligation to repay funds received as an educational benefit,

courts have considered congressional intent in passing § 523(a)(8) and have adopted a three-prong test, referred to as the *Brunner* test,[4] for analyzing when student loans should be discharged in the course of bankruptcy proceedings. *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1112 (9th Cir. 1998). Under this test, the debtor must prove each of the following elements by a preponderance of the evidence before a discharge can be granted:

1)    That the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

2)    That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

3)    That the debtor has made good faith efforts to repay the loans.

*Pa. Higher Educ. Assistance Agency v. Birrane (In re Birrane),* 287 B.R. 490, 494 (B.A.P. 9th Cir. 2002) (citing *Pena*, 155 F.3d at 1111). On appeal, Educational Credit argues the bankruptcy court erred in applying all three prongs of the *Brunner* test.

I)    <u>Minimal standard of living</u>

Under the first prong, the court examines the debtor's "current income and expenses to

---

scholarship, or stipend; or
(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

11 U.S.C. § 523(a)(8).

[4]It is called the "*Brunner* test" because it was first adopted in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2d Cir. 1987). The Ninth Circuit expressly adopted the test in *Pena*, 155 F.3d at 1112 ("[W]e join the Second, Third and Seventh Circuits and adopt the *Brunner* test to determine whether, pursuant to 11 U.S.C.§ 523(a)(8)(B), a debtor in bankruptcy may discharge a student loan.").

PAGE 5 - OPINION AND ORDER

see if payment of the loan would cause her standard of living to fall below that minimally

necessary." *Birrane*, 287 B.R. at 495.  To satisfy this prong, the debtor must do more than show

her finances are tight.  *Rifino*, 245 F.3d at 1088.  She must show that "it would be

'unconscionable' to require [her] to take steps to earn more income or reduce her expenses."

*Birrane*, 287 B.R. at 495; *Chapelle v. Educ. Credit Mgmt. Corp. (In re Chapelle)*, 328 B.R. 565,

570 (Bankr. C.D. Cal. 2005).  As is evident, there are two aspects to this showing: first, that the

debtor has maximized her income, and second, that she has minimized her expenses.

> A)    Maximized income

Under this analysis, the court must consider whether the debtor is "making a strenuous

effort to maximize her personal income within the practical limitations of her vocational profile."

*Healey v. Mass. Higher Educ. (In re Healey)*, 161 B.R. 389, 394 (E.D. Mich. 1993) (internal

quotations and citation omitted).  *Healey* is instructive on this point.  There, the debtor had a

masters degree in teaching and made less than $11,000 a year teaching.  *Id.* at 391-92.  However,

evidence in the record showed that she made more money before attending school when she

worked as a secretary.  *Id.*  The court held the debtor had not shown she had maximized her

income, stating:

> If the market does not currently value particular skills (e.g. teaching skills) highly
> enough to provide sufficient well-paying jobs to allow the debtor a place in that
> vocation, then she may be forced through circumstances to fall back on other job
> skills even though to her they may be not quite as sophisticated, refined or
> aesthetically pleasing.  How many graduates (even those who have not enjoyed a
> publicly funded or loan-guaranteed education) aspire to careers which they hope
> and believe will be personally fulfilling to them as well as financially rewarding?
> Almost all of them, one would hope. And how many will find that, at times, the
> employment which would be most satisfying personally must be abandoned,
> delayed or augmented if the financial rewards that are available are not sufficient
> to allow them to meet their financial obligations? The experience of life teaches

PAGE 6 - OPINION AND ORDER

us that, other than the privileged few, all encounter intervals in which they cannot do precisely what they desire because it simply does not pay enough money. A resolute determination to work in one's field of dreams, no matter how little it pays, cannot be the fundamental standard from which "undue hardship" under § 523(a)(8)(B) is measured.

*Id.* at 395.

Similarly, in *Birrane*, the debtor had a B.A. in Social Work and a M.F.A in dance, and she worked as a dance instructor half time and volunteered the rest of her time to her non-profit dance company. *Birrane*, 287 B.R. at 499. "There was no evidence that she explored the possibility, or was even willing, to take a second job outside her field that would allow her to meet her student loan obligations." *Id.* The court reasoned that she could have looked for a job in social work, or found a second job for when she was not teaching or working with the dance company, or even looked for more lucrative ways to use her dance experience, like coaching figure-skaters, gymnasts, or college dance teams. *Id.* at 499-500. And because she had not tried any of these options, the court found she had not maximized her income: "The debtor may not willfully or negligently cause h[er] own default, but rather h[er] condition must result from 'factors beyond h[er] reasonable control.' Declining to obtain additional work is not a factor beyond [the debtor's] reasonable control." *Id.* at 500 (citation omitted).

      B)    Minimized expenses

In considering this issue, courts look to whether the debtor is in a "self-imposed hardship" due to unnecessary expenses. *See, e.g., Chapelle*, 328 B.R. at 570 (finding debtor was living beyond her means "in a high rent district"); *Rifino*, 245 F.3d at 1088 (listing cases where "courts have declined to discharge student loan debt where the debtor's budget included items such as cable television, a new car, and private schooling for a child"); *United Student Aid Funds, Inc., v.*

*Nascimento (In re Nascimento)*, 241 B.R. 440, 445 (B.A.P. 9th Cir. 1999) (finding debtor could make loan payment if adjusted expenses by reducing $544 per month vehicle expense or only maintaining professional license in state of residence). Some courts have also taken specific note of the debtor's recreational travel expenses. *See Chapelle*, 328 B.R. at 569 (noting debtor's purchase of plane tickets for her and her boyfriend to travel to Idaho and a recent trip she took to Arizona with a friend in finding she had not minimized her expenses); *see also Birrane*, 287 B.R. at 495 (noting debtor "takes no vacations" in determining first prong was satisfied). And aside from more "luxury" type expenses, an unreasonable amount spent on an otherwise reasonable expense can show the debtor is able to maintain a minimal standard of living in spite of loan payments. *See Mandala v. Educ. Credit Mgmt. Corp. (In re Mandala)*, 310 B.R. 213, 221-22 (Bankr. D. Kan. 2004) (finding debtors could maintain minimal standard of living if they adjusted expenses, including food budget). But where "extraneous expenses [are] *de minimus*," the debtor has not failed to sufficiently prove the inability to maintain a minimal standard of living. *Birrane*, 287 B.R. at 496. Finally, courts also consider the extent to which having other debts discharged in bankruptcy will aide debtors in satisfying their educational loan obligations. *See Chapelle*, 328 B.R. at 571; *see also Mandala*, 310 B.R. at 222.

      C)     Analysis

      Here, the bankruptcy court found Ms. DeGroot met her burden of proof on this prong because the record shows her monthly expenses equal roughly $2000, and the salary she is able to draw from her business is only $700 a month. The court pointed out that to add the cost of her loan payment to this calculous would be "impossible." On appeal, Educational Credit makes essentially three arguments: (1) that Ms. DeGroot has not sufficiently maximized her income by

choosing to stay with her failing business, (2) that she could further reduce her expenses by selling her home and cashing in on her equity, or taking on a roommate to help with the mortgage, and (3) that her recent trip to Europe shows she has not minimized her expenses.

In considering Educational Credit's arguments, I find Ms. DeGroot has sufficiently minimized her expenses. The evidence is clear that Ms. DeGroot does not have the kinds of expenses found unnecessary in other cases. And as for her trip to Europe, I do not find it compelling under the circumstances presented here. Ms. DeGroot testified that due to previously earned travel points, her airfare and two nights hotel stay were free. She also stated her additional hotel stay was $35 a night and she spent very little on food and incidentals. Thus, Ms. DeGroot actual financial outlay was relatively de minimus.

Thus, the question is whether Ms. DeGroot has maximized her income. There is good reason to believe based on the evidence presented in this case that Ms. DeGroot could make substantially more income if she closed her business and sought alternate employment. And certainly, as discussed above, there is support in the caselaw for requiring a debtor to work at something other than her chosen job or profession if doing so would be more profitable. *Birrane*, 287 B.R. at 500; *Healey*, 161 B.R. at 395; *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 386 (6th Cir. 2005). But at this point, I find Ms. DeGroot has not yet failed to maximize her income by sticking with her business in hopes it will become a success.

When Ms. DeGroot decided to open her own business, she utilized her extensive business skills in determining whether her venture would be viable, and she had a reasonable basis to believe it would. There are also several indications it could do well in the near future. Since opening, the business has continued to grow financially such that Ms. DeGroot is now able to

draw a salary.  Additionally, the local newspaper recently published an article featuring the

business, and the street car has extended its route to pass nearby.  If in the short term, her

business does not become at least as profitable as her viable alternatives, it may be necessary for

Ms. DeGroot to give up her business in order to maximize her income.  But I find that point has

not yet been reached.  *See Birrane*, 287 B.R. at 498 (finding debtor's future prospects were quite

good where dedication to dance company shows she works hard, where she has skills for running

the company as evidenced by her ability to keep it afloat for several years, and where she had

attained public exposure).

However, I do find Ms. DeGroot has failed to maximize her income by not seeking

additional income.  Ms. DeGroot is a single woman with no dependents living in a three bedroom

home.  As such, it would be relatively painless for her to take on a roommate to bring in some

extra income.  She would likely not be able to bring in enough to bridge the gap between her

monthly expenses and income.  But because her remaining debts, aside from her household

expenses, were discharged in bankruptcy, she could earn enough to pay her relatively minimal

student loan payment.  The gap would remain, but she could meet her student loan obligation at

no further detriment than she is currently facing.  Thus, in that limited sense, I find the

bankruptcy court erred in finding Ms. DeGroot satisfied the first prong.

II)    Additional Circumstances

"This second prong is intended to effect 'the clear congressional intent exhibited in

section 523(a)(8) to make the discharge of student loans more difficult than that of other

nonexcepted debt.'"  *Pena*, 155 F.3d at 1111 (citing *Brunner*, 831 F.2d at 396).  Thus, to satisfy

this prong, the debtor must provide evidence that the "road to recovery is obstructed by the type

of barrier that would lead [the court] to believe [s]he will lack the ability to repay for several years." *Birrane*, 287 B.R. at 497 (citation omitted). This necessarily involves speculating about the debtor's future earning ability and financial circumstances. Courts have identified the following "additional circumstances:" mental or physical health problems that affect the debtor's ability to work, medical expenses, lack of usable job skills, severely limited education, and a large number of dependents.[5] *Pena*, 155 F.3d at 1113-14; *Birrane*, 287 B.R. at 497; *Chapelle*, 328 B.R. at 571; *Oyler*, 397 F.3d at 386.

The common thread of the prior rulings is that those facts generally considered "additional circumstances" under the *Brunner* test are things beyond the debtor's control. Where the debtor has reasonable control over the circumstancing causing hardship, courts are much more reluctant to go against Congress's general policy of not discharging student loan debt. *See Birrane*, 287 B.R. at 497-98, 500 (finding second prong not met as debtor had "no problems that were *insurmountable* or that *impaired her ability to work*" and noting, "[t]he debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control") (internal quotations and citation omitted) (emphasis added);

---

[5] In addition, the Ninth Circuit in *Pena* indicated the value of the debtor's education may also be relevant, though it is not properly viewed as a "*separate factor*." 155 F.3d at 1114. There, the debtor incurred just under $10,000 in loans to attend ITT Technical Institute and earned an "Associate of Specialized Technology" certificate. *Id.* at 1110. On the other hand, in *Chapelle*, the Bankruptcy Court for the Central District of California recently held the value of the debtor's education is not a proper consideration. 328 B.R. at 572. Ms. Chapelle worked for some time as a paralegal and then decided to get a law degree. She took out significant debt, but after completing her degree, she could not pass the bar. She was also unable to secure full-time employment as a paralegal again, "believ[ing] that her inability to find employment is partially attributable to the fact that some employers are put-off by her law degree." *Id.* The court held that to find the debtor's education valueless would be "both 'improper' and 'antithetical' to the spirit of the guaranteed loan program." *Id.* (citing *Brunner*, 46 B.R. 752, 756 n. 3 (S.D.N.Y. 1985).

*Chapelle*, 328 B.R. at 571 ("[T]he evidence does not show that [the debtor's] difficulties are

likely to persist, or that she is faced by 'additional circumstances' that she cannot overcome or are

beyond her reasonable control."); *Oyler*, 397 F.3d at 386 ("[M]ost importantly, [the

circumstances] must by beyond the debtor's control, not borne of free choice.").

 Here, in addressing the "additional circumstances" prong of the *Brunner* test, the

bankruptcy court stated:

>  Now, I want to be very clear: Based upon my review of Ms. DeGroot's
> resume, listening to her testify on the stand, I'm prepared to find she's a very
> professionally accomplished woman.  She comes across as professional and
> credible on the witness stand, and if an employer were to give her a chance again
> in a CFO position such as she had with the office furniture company, I have no
> doubt she could succeed in in [sic].  And its probable that lightening could strike
> and that she could find such a job.
>  But the availability of such a job to her at this point in time I find would be
> purely speculative.  Before she began the current business she testified that she
> had worked seriously and actively in looking for an alternative job for two years;
> that she sent out 25 serious resume job applications; that she sent out a further 25
> letters of inquiry with regard to public - - to possible employment, resulting in
> nothing.
>  Now, during the time she was looking, there's no question that we were
> dealing with a particularly depressed economy, and there may be some
> improvement in the economy since the prior period when she was looking for
> work.  However, I've noted with interest, in my position as a bankruptcy judge,
> that the real upswing in filings, in this district and elsewhere, has been on the
> consumer side.  It's an interesting and different phenomenon from what we usually
> see.
>  Businesses have mostly battened down the hatches, and the way they have
> been able to keep themselves out of bankruptcy is they have cut expenses by
> cutting employment, by outsourcing jobs.  Whether it's legal or not, they have
> tended to terminate more senior people at higher levels of compensation and
> higher drains of benefits in order to hire younger employees who can be employed
> at lower salary, lower benefits, and at the particular ages involved, maybe
> healthier.
>  Ms. DeGroot is 52 years of age.  She has looked seriously for alternative
> jobs.  She chose to open her business because she made a rational evaluation of
> her circumstances and determined it was highly unlikely she was going to be able
> to find a decent job as a employee and thought, potentially, that greater economic

rewards could be gleaned through the operation of her own business.

Because of the expenses in the early start-up phases - - phase of her business, in light of enhanced competition, she ran into the wall, and that's why she's here.  But she still hopes and has some reason to hope, as expressed in her testimony, that the business can become a success. . . .

Again, I don't find it was an irrational decision on her part to try to open her business and make it a success.  It may still be a success, but at this point, I can't find that in [sic] future it's likely, even if it generates enough profit, that she breaks even on her expenses, that she's going to have any material excess income to make student loan payments from that business.

If the business fails, and she goes out into the marketplace to find a new job as an employee, her prospects are such that the lightening could strike and some employer would give her a chance that her resume and her achievements deserve.  She was realistic in her testimony that she may not be able to find a long-term job.  She may not be able to find more than part-time employment, or she may not be able to find a job that pays her more than the $25,000 she's estimating or projecting as what she could reasonably hope from an employer to receive going forward.

In those circumstances, I don't find that the <u>Bruner</u> [sic] test requires that all speculation be exhausted to satisfy the second prong of the test.  Based on the evidence in front of me, I find that it is unlikely in the future that Ms. DeGroot would be able to find employment, whether in her current business or otherwise, that would allow her to pay her expenses and make the required payments under her student loan obligations to [Educational Credit].

Trial Tr. at 66-69.

Based on this explanation, it is unclear exactly what facts the bankruptcy court found compelling.  However, the "additional circumstances" justifying discharge must be specifically identified, *see Pena*, 155 F.3d at 1113 (noting bankruptcy court failed to identify the circumstances on which it based its decision and proceeding to analyze two factual findings it may have relied on), and upon analysis, a few possibilities emerge: (a) Ms. DeGroot's age, (b) the general economic condition, and (c) the fact that Ms. DeGroot decided to open her own business.

A)    Debtor's age

In *Chapelle*, the court stated the "[debtor's] age does not constitute an 'additional

PAGE 13 - OPINION AND ORDER

circumstance,' especially when she is healthy and does not suffer from any age-related illnesses that affect her ability to work." 328 F.3d at 572. On the other hand, in *Hinkle v. Wheaton College (In re Hinkle)*, 200 B.R. 690 (Bankr. W.D. Wash. 1996), the court reasoned that where the loan repayment plan increased the monthly payment periodically over time, the "debtor, at her age [early fifties] and with her earning capacity" would likely be unable "to afford the increased payments without undue hardship." *Id.* at 694. Recognizing this inconsistency, the general consensus appears to be that where debtors choose to incur educational debt later in life, the fact that they will reach retirement age during the loan repayment period is not enough alone to justify discharge under § 523(a)(8). As one court recently explained:

> [T]he fact that [the loan] will persist into [the debtor's] late age is the result of her choosing to return to school on borrowed money at the age of 36. The fact that this Court should not "impose its own values on a debtor's life choices" should not completely insulate [the debtor] from the consequences of her choice to attend school later in life in hopes of taking up a profession. . . . That student loan payment periods may progress beyond a borrower's retirement age, standing alone, should not skew the second Brunner test against lenders.

*Mandala*, 310 B.R. at 222.

I agree with this consensus. Certainly, choosing to incur debt in pursuit of an education later in life is a decision within the debtor's control, and simply because things do not work out as the debtor had hoped does not make age alone a sufficient reason to discharge student loans. Indeed, to hold otherwise would be to throw the door to student loan discharge wide open to a significant number or debtors, thereby frustrating clear congressional intent to the contrary. Of course, that is not to say that age is never properly considered as an additional circumstance causing undue hardship. *See Brunner*, 831 F.2d at 396 (finding no "additional circumstance" exist where debtor "is not disabled, *nor elderly*") (emphasis added); *Healey*, 161 B.R. at 396

PAGE 14 - OPINION AND ORDER

(same).

Ms. DeGroot seems to argue, and the bankruptcy court apparently agreed, that her age is a significant factor because employers generally do not hire older workers. Even if I were to agree with this proposition, such a finding must be based on facts relevant to the particular debtor involved. This is not a general principle of which I can simply take judicial notice. For one reason, Congress provided a specific remedy for workers discriminated against in employment, including hiring, based on age. Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634. And to find as a general matter that age is an additional circumstance undermining the ability to find employment sufficient to discharge student loan debt would be to deny an entire federal remedial scheme. Thus, to the extent the bankruptcy court based its decision on its general understanding of how older workers fare in the employment market, I find error. *See* Trial Tr. at 67 ("Businesses have mostly battened down the hatches . . . . Whether it's legal or not, they have tended to terminate more senior people at higher levels of compensation and higher drains of benefits in order to hire younger employees who can be employed at lower salary, lower benefits, and at the particular ages involved, maybe healthier.").

            B)      General economic condition

In addition to Ms. DeGroot's age, the bankruptcy court discussed the general economic conditions as a justification for discharging Ms. DeGroot's student loans. Ms. DeGroot made several grim predictions at trial about her likely future prospects, including the possibility that if she looked for alternate employment she would likely work in retail for minimum wage. On the current record, it appears these predictions were based purely on speculation. Obviously a certain amount of speculation is innate in determining the future, but that speculation must have

PAGE 15 - OPINION AND ORDER

some factual basis. *See Chapelle*, 328 B.R. at 572 (considering debtor's recent attempts to secure

full-time employment and vocational expert testimony about debtor's specific profession and

location in assessing the second prong); *Rifino*, 245 F.3d at 1089 (considering testimony from

expert in debtor's profession).  Ms. DeGroot admits she has not seriously looked for employment

in the marketplace since her unsuccessful search before opening her business.  Several years have

passed since then, and certainly the economy has changed over time.  Additionally, there is

insufficient evidence in the record concerning the types of jobs she looked for and the locality(s)

of her search.  As such, Ms. DeGroot has failed to meet her burden on this issue.

The bankruptcy court also relied on its own general assessment of the economic condition

in discharging the loan.  I have considerable reservation as to whether this is a proper basis for

decision.  In any event, to establish the second prong, the "additional circumstance" must be

something that can be expected to cause hardship for "a significant portion of the repayment

period of the student loans." *Pena*, 155 F.3d at 1111.  There is no evidence in the record

establishing the economic condition that existed when she last looked for work, or that exists

today, will persist in the long-term.  Thus, I find the economic conditions Ms. DeGroot is facing

are not a proper "additional circumstance" justifying discharge.

        C)      Opening her own business

Finally, it appears the bankruptcy court found the second prong satisfied in part because

Ms. DeGroot made a rational decision to open her own business, which currently has no

indication of producing the amount of income necessary for Ms. DeGroot to pay off her loans.

*See* Trial Tr. at 69 ("Based on the evidence in front of me, I find that it is unlikely in the future

that Ms. DeGroot would be able to find employment, whether in her current business or

PAGE 16 - OPINION AND ORDER

otherwise, that would allow her to pay her expenses and make the required payments under her student loan obligations to [Educational Credit].").  The bankruptcy court's reasoning as to how this meets the "additional circumstances" prong is not clear.  Simply because Ms. DeGroot's decision to go into business for herself was reasonable under the circumstances, does not mean she is entitled to rely on that choice as a justification for discharge.

As discussed above, she has not reached the point yet where she has failed to maximize her income by persisting in her business venture, but at the same time, I cannot conclude that she is facing undue hardship that is likely to persist long into the future simply because she chose to start her own business.  There is nothing compelling Ms. DeGroot to continue with the business, except her own ambition.  Indeed, the bankruptcy court found she is a "very professionally accomplished woman" and that she could succeed were she to reenter her prior profession. Certainly, if her business never rises significantly above its current level of profitability, it may no longer be supportable as a rational decision.  Thus, unlike having an illness, disability, or limited education and job skills, Ms. DeGroot's circumstances are largely within her control.  She can continue to try to make the business a success, or she can attempt to reenter the marketplace using the wide range of skills she has acquired during her life.  And where she has such options, it is improper to conclude that she has presented "additional circumstances" justifying discharge of her student loans.  Thus, regardless of the bankruptcy court's ultimate reasoning, I find the second prong of the *Brunner* test is not satisfied in this case.

III)    <u>Good Faith Effort to Repay</u>

The final prong of the *Brunner* test is whether the debtor has made a good faith effort to repay her student loan.  Courts consider a number of factors in deciding whether the debtor has

exercised good faith, including (1) whether the debtor has worked to maximize income and minimize expenses, (2) whether the debtor has made an effort to negotiate a repayment plan, (3) whether the debtor has made any payments on the loan, and (4) the timing of the debtor's attempt to have her loan discharged. *Birrane*, 287 B.R. at 499; *Brunner*, 831 F.2d at 397; *Chapelle*, 328 B.R. at 573. Whether the debtor has made any payments or not is important, but it is not determinative of good faith. *Birrane*, 287 B.R. at 499. The debtor's obligation act in good faith only ends when the loan has been paid in full or discharged. Thus, the debtor must continue making good faith efforts to repay even after a bankruptcy petition has been filed. *Id.* at 500.

Here, the bankruptcy court found Ms. DeGroot acted in good faith as evidenced by her (1) success in paying off prior student loans, (2) continuous payments on her current loans while employed with her previous employer, (3) efforts to refinance before filing for bankruptcy, and (4) efforts to minimize her expenses and maximize her income. The bankruptcy court is correct that Ms. DeGroot has not been an indolent debtor, but rather has made considerable efforts to manage her expenses and repay the loan. However, as Educational Credit argues, Ms. DeGroot did not explore all possible repayment plans available to her. Specifically, she declined to apply for an income contingent repayment plan that could allow her to proceed without making payments based on her income level and ultimately discharge her loan if she is unable to pay within a specified period of time. Ms. DeGroot argued, and the bankruptcy court apparently agreed, that given her financial condition, even this option would pose an undue burden. This is in error. Even though Ms. DeGroot renegotiated her loan prior to filing for bankruptcy in an effort to meet her obligations, given Congress's clear mandate that student loans are generally non-dischargeable, she acted in bad faith by failing to even apply for the income contingent

PAGE 18 - OPINION AND ORDER

program during the bankruptcy proceedings.  *See Birrane*, 287 B.R. at 500 (debtor in bad faith

where stopped considering repayment options even after she learned of Income Sensitive

Repayment and Forbearance Program); *see also Chapelle*, 328 B.R. at 573-74 (debtor acted in

bad faith where "abjectly refused to take advantage of available repayment options").  Thus, I

find she has failed to meet her burden on the third prong of the *Brunner* test as well.

### Conclusion

The bankruptcy court was clearly, and understandably, sympathetic to this debtor.  Ms.

DeGroot has made considerable efforts to honor her obligations in the face of continued financial

difficulty.  But, Congress has clearly expressed its intent that student loans generally not be

discharged in bankruptcy, and whereas Ms. DeGroot enjoys good health and has significant

marketable skills and experience, the facts of this case do not establish that repayment would

impose an undue burden on her.  Admittedly, she will likely struggle, but she intentionally

incurred educational debt later in life when she already had skills and education that would allow

her to earn a living, and she has made financial decisions that, while reasonable, were risky.

Thus, because I find Ms. DeGroot has not shown she is entitled to discharge under the *Brunner*

test, the bankruptcy court's decision discharging her student loan is REVERSED and the debt is

REINSTATED.


DATED this __7th__ day of March, 2006.


/s/ Michael W. Mosman_____
MICHAEL W. MOSMAN
United States District Court


PAGE 19 - OPINION AND ORDER